UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

UNITED STATES OF AMERICA,

v.                                                                  Case No. 3:22mj447-HTC

CONNOR G. LYONS,

    Defendant.
_____/

MEMORANDUM OPINION

The Government charged Defendant Connor G. Lyons in a superseding information with one count of operating a vehicle under the influence of alcohol, a drug, drugs, or any combination thereof, to a degree that rendered him incapable of safe operation, in violation of 36 C.F.R. § 4.23(a)(1) and one count of speeding, namely going 59 mph in a 35 mph zone, in violation of 36 C.F.R. § 4.21(c). ECF Doc. 23. The Court held a bench trial on April 11, 2023, and took the matter under advisement.

In determining whether the Government has proved its case beyond a reasonable doubt, the Court must look at the "totality of the circumstances." *United States v. King*, 894 F. Supp. 2d 737, 745-46 (W.D. Va. 2012). The totality of the circumstances here includes the toxicology results, the testimony of FDLE forensic toxicologist Lauren Huene, the Court's assessment of the dash camera video, Exhibit 1A, Ranger W. Henderson's testimony regarding Lyons' impairment, Lyons'

testimony, and Lyons' performance on standardized field sobriety tests. After carefully considering the evidence adduced at trial, and for the reasons set forth below, the Court finds the Government has not met its burden of proving Lyons' guilt as to either charge. Thus, for the reasons set forth below, the Court finds Lyons NOT GUILTY of violating 36 C.F.R. § 4.23(a)(1) and 36 C.F.R. § 4.21(c).

## I. DUI

It is undisputed Lyons tested positive for the presence of benzoylecgonine, MDA, and cocaine shortly after his arrest for driving under the influence. Lyons does not dispute he used controlled substances the night before his arrest. The presence of these controlled substances in Lyons' urine, however, is not determinative of whether Lyons was under the influence, or to what degree. First, there is no evidence of the amounts of these substances in Lyons' urine.[1] Second, Huene testified the effect of the substances and the level of any impairment depends on the frequency of use as well as the particular individual's ability to metabolize the substance. She also testified the presence of the substances in a person's urine does not indicate the substance is affecting the person or that the person is incapable of safe operation of a vehicle. Third, Lyons testified he did not use any controlled

---

[1] Heune testified MDA can be detected 1-2 days after use, BZ, 2-3 days after use, and cocaine, up to 5 days after use. Also, the effect of MDA may last for 6-8 hours after consumption, but that time fluctuates by user.

substances after midnight, more than 14 hours before his vehicle was stopped.[2] Thus, the issue for the Court is whether Lyons was under the influence of a controlled substance to the degree that he was incapable of safe operation of a vehicle.

**A. The Stop**

Around 2:35 PM on Sunday May 29, 2022, while Ranger Henderson was patrolling that portion of Hwy 399 located in Gulf Islands National Seashore, within the Northern District of Florida, his radar signaled a vehicle traveling at rate of speed faster than the speed limit. The vehicle, which was being driven by Lyons, was traveling in the opposite direction of Ranger Henderson. Ranger Henderson turned on his lights, made a U-turn, and traveled for about 39 seconds before coming within two car lengths of the vehicle. At that point, Ranger Henderson turned on his sirens, and Lyons immediately began applying his brakes and slowing down. After passing some sea oats and sand dunes, Lyons turned on his right blinker, and pulled over at the first flat area of sand he came across. Because Lyons turned his vehicle at a 45-degree angle into the sand, rather than pull his vehicle over on the side of the road, the vehicle got stuck in the sand and eventually had to be towed.

After calling in Lyons' tag number and asking for a tow truck, Ranger Henderson approached the driver's side window and introduced himself, at which

---

[2] No controlled substances were found in the vehicle.

Case No. 3:22mj447-HTC

point Lyons stated he did not know where to pull over and Ranger Henderson told Lyons what he did was not the best idea, to which Lyons responded that he is aware of that now. Ranger Henderson told Lyons he pulled him over for speeding, asked if he had any weapons, and asked for his license, proof of insurance, and registration. Ranger Henderson informed Lyons he was going 59 mph in a 35 mph zone, and also asked Lyons how much he had to drink, to which Lyons said he had not been drinking. Lyons provided his driver's license and showed Ranger Henderson proof of insurance on his phone, explaining that he was waiting for the hard copy to be mailed to him. Lyons explained he was looking for the parking lot where his tent was located and had passed it. Lyons also explained he did not realize the sand was so soft when he pulled over and also was not sure if Ranger Henderson was trying to pass him. Ranger Henderson informed Lyons the sand in the area is soft because roadside parking is not allowed and thus the sand does not get packed, like in other places on the beach. This interaction lasted for about 4 minutes, after which time, Ranger Henderson walked to his car to check on Lyons' driver's license. Approximately 5 1/2 minutes later, Ranger Henderson stepped out of his vehicle, walked back to Lyons' car, and asked Lyons to step out of the vehicle to "talk about it."

Ranger Henderson testified he observed the following clues of impairment after making the initial stop: (1) Lyons was speeding; (2) Lyons did not immediately

pull over; (3) Lyons pulled over into the sand instead of on the side of the road; (4) Lyons "passed over" his driver's license before handing it over; (5) Henderson had to ask Lyons "multiple" times for his insurance and registration; and (6) when Lyons was asked to get out of the vehicle he lost his balance and had to use the vehicle for support.

Having viewed the dash cam video, the Court does not find the circumstances associated with the initial stop, either singularly or considered in total, show Lyons was impaired to the extent he was unable to operate the vehicle safely. First, speeding, alone, is not evidence of impairment. *United States v. Foster*, 829 F. Supp. 2d 354, 370 (W.D. Va. 2011) ("Contrary to the suggestion made by the government on brief, speeding alone does not establish that defendant was intoxicated to a degree that rendered him incapable of safe operation."). Second, Lyons pulled over when Ranger Henderson's vehicle came to about two vehicle lengths behind Lyons' vehicle and Lyons testified he pulled over as soon as he saw Ranger Henderson's lights behind him. Indeed, Ranger Henderson testified Lyons "immediately" pulled over after the Ranger activated his sirens and less than 40 seconds passed between Ranger Henderson's U-turn and Lyons' stop.

Third, although Lyons did not pull over on the side of the road, he did slow down, use his blinker, and wait for a clear flat space to pull over. As Lyons immediately acknowledged, pulling over into the sand was not the best idea;

however, he also stated he was trying to get out of the Ranger's way and did not know the sand would be so soft. The Government argued Lyons was familiar with the area, had been there three times, and had ridden his bike in the area. Even so, the Court does not find the manner in which Lyons pulled over to be evidence of impairment. There is no testimony or evidence that Lyons was observed swerving, weaving, or otherwise driving erratically before he was pulled over.

   Fourth, the video does not show Lyons being unable to provide his driver's license and Ranger Henderson testified on cross-examination that Lyons had his driver's license ready in his hand when Ranger Henderson approached. As for the proof of insurance, it appears Ranger Henderson had to ask for it twice because he was unaware Lyons was trying to pull it up on his phone. Thus, although Ranger Henderson testified that upon making initial contact with Lyons, he seemed "nervous," "excited," and was unable to follow instructions – the video shows to the contrary. Finally, the video also does not show Lyons "losing his balance" upon exiting the vehicle. Instead, Lyons leaned on the vehicle because of the soft sand. Indeed, as defense counsel pointed out during the trial, Ranger Henderson also lost his footing in the sand and had to push off the vehicle when he was demonstrating the field sobriety tests.

The Court did not observe anything in the video from the time of the stop until Lyons was asked to exit the vehicle to support a determination that Lyons was impaired to the point of being unable to safely operate his vehicle.

**B. The Field Sobriety Tests**

About 10 minutes after being pulled over, Ranger Henderson told Lyons he wanted to make sure it was safe for Lyons to drive and asked if he would consent to performing standardized field sobriety tests ("SFSTs"). Lyons consented. The first test Ranger Henderson asked Lyons to perform was the Horizontal Gaze Nystagmus Test. Ranger Henderson and Lyons discussed whether Lyons had any medical issues related to his eyes, other than wearing glasses, and Lyons said he did not. Lyons told Ranger Henderson he was just very tired and he has very dry eyes. The test was performed and no test-specific clues of impairment were identified; Ranger Henderson, however, testified Lyons' eyes were dilated. During this interaction, Lyons was able to follow all instructions Ranger Henderson provided. The Court did not observe any issues with the way Lyons communicated with Ranger Henderson, either in his manner of speaking or his understanding of the conversation.

The next test Ranger Henderson asked Lyons to perform was the walk-and-turn. Ranger Henderson started explaining the test and was interrupted with a call. Lyons can be seen standing still with his arms to his side as directed during this time.

Then, Ranger Henderson moved Lyons to the white line on the road (separating the main road from the shoulder) to perform the test.  At that point, Ranger Henderson answered another call – during which, Lyons, once again is seen standing still on the white line with his hands by his side.  Also, as defense counsel noted, before entering the roadway and getting on the white line, Lyons looked behind him to make sure there was no oncoming traffic.  Ranger Henderson instructed Lyons to "take this straight line ok and then what you're going to do, you're going to do, put your left foot on the line like you have it and take your right foot and put it in front of your left foot, with your right heel up against your left toe."  At that point, Lyons started the test and Ranger Henderson told him to stand still until he is told to start the test.  Ranger Henderson told Lyons to take 9 steps, make a 180-degree turn, and then take 9 steps back.  Ranger Henderson then demonstrated the walk-and-turn but did not do so on the white line.  Ranger Henderson told Lyons to look at his feet throughout the test, leave his hands by his sides, count his steps out loud, and not to stop until the test was completed.

Ranger Henderson identified the following clues related to Lyons' performance of the walk-and-turn test: (1) Lyons started the test before he was told to do so; (2) Lyons paused at step 8; (3) Lyons swayed before starting the test, and (4) Lyons raised his arms more than 6".  The Court's assessment of the video, however, does not support Ranger Henderson's conclusions.  First, while Lyons

started the test before he was instructed to do so, Ranger Henderson admitted he "stumbled" through parts of the instructions and also started and stopped them at least 3 times. Second, the video shows Lyons paused slightly at step 8 because his left toe got caught on his right heel, not because he had to regain his balance. Third, while Lyons appeared to sway a bit while he was balancing on the white line, the video shows that he was standing with his right foot in front of his left toe on the white line for about 1 minute, with car traffic driving by him, while Ranger Henderson was giving him instructions on the test. Lyons did not have any problems counting his steps, did not exceed the number of steps, and did not have any issue with the turn. Also, he stayed on the white line during the entire test and his hands stayed to his sides.

    The last test Ranger Henderson asked Lyons to perform was the one-legged stand. Ranger Henderson instructed Lyons to raise either foot 6" off the ground and count out loud "one thousand one, one thousand two … and so on" until he is told to stop. He instructed Lyons to keep his hands down to his side, his leg straight, to look at his raised foot, and to keep his foot parallel to the ground.

    Ranger Henderson identified several clues of impairment with Lyons' performance of the one-legged stand test: (1) Lyons raised his leg with a bent knee; (2) used his left hand to help him keep his left knee raised; and (3) Lyons slowed down his counting.

Once again, a review of the video does not support a finding of impairment. First, while Lyons bent his knee, that conduct was consistent with the instruction to raise his foot and keep it parallel to the ground. Second, while Lyons may have put his hand slightly under his left buttocks, he did not violate the instructions, as his hands remained by his side. Finally, while Ranger Henderson testified Lyons' counting slowed down and was 10 seconds behind his watch, Ranger Henderson did not check his watch until 8 seconds after Lyons began counting. Also, Lyons maintained his balance despite having to perform this test on the white line in the roadway while cars were driving by him and did not put his foot down during the test.

While Lyons may not have performed the SFSTs perfectly, his performance was not so poor that it supports a finding that Lyons was too impaired to safely operate the vehicle. Any deviations Lyons had in performing the test were, at best, minor, and could as easily be attributed to a lack of clear instructions as to any impairment.

**C. Lyons' Conduct**

After Lyons completed the Field Sobriety Tests, Ranger Henderson asked Lyons to level with him and tell him whether he had been drinking. Lyons told Ranger Henderson he did not have anything to drink. Ranger Henderson then asked Lyons if he was under the influence and Lyons said, "from last night." Lyons

admitted to pulling an "all nighter" and that although he did not "get crazy," he traveled in town, traveled solo, and was exhausted. The Government argues Lyons thus admitted to being under the influence. It is not clear, however, whether Lyons was admitting to being under the influence of any controlled substances or whether he was admitting to staying up late and being tired. Regardless, Lyons' statement is not an admission that he was under the influence to the extent it rendered him incapable of safely operating a vehicle.

     Indeed, the dash cam video introduced into evidence by the Government fails to show Lyons was too impaired to drive. The video shows that about twenty minutes after Ranger Henderson pulled Lyons over for speeding, he decided to arrest him for DUI. From that point until about an hour and 20 minutes later, Ranger Henderson traveled with Lyons to the Gulf Breeze Police Department ("GBPD") where Lyons agreed to both a breathalyzer test and to provide a urine sample. During that more than one hour time span, Ranger Henderson and Lyons engaged in several conversations and at no time during those conversations did Lyons appear to be incoherent, his speech slurred or mumbled, or impaired.

     To the contrary, Lyons asked several questions that show he was alert and oriented to his surroundings, such as asking (1) how much it will cost for him to get his car out of tow; (2) how long he will be in jail; (3) how much it will cost for him to bond out; (3) whether he will get a chance to get any water while he is at the jail;

and (4) how he failed the SFSTs. Moreover, even before he was transported from the scene Lyons coherently told Ranger Henderson where his phone and wallet were in his vehicle and, and while at the GBPD, Lyons pointed out his name was wrong on the implied consent form. Also, although Ranger Henderson testified Lyons' speech was mumbled and slurred, there was no evidence of this on the video – a point Ranger Henderson conceded on cross. Ranger Henderson also testified on cross that Lyons had no problems walking; he did not sway, stagger, or fall.

The facts of this case are in stark contrast to those cases where the court has adjudicated a defendant guilty under 36 C.F.R. § 4.23(a)(1). In *United States v. Atkinson*, 128 F.App'x 64 (10th Cir. 2005), for example, the evidence showed (1) defendant had consumed two pints of beer and a shot an hour before getting in the vehicle; (2) law enforcement stopped defendant's vehicle because it appeared to be traveling at a speed of more than 60 mph in a 25 mph zone; (3) defendant was unable to maintain his balance during the walk-and-turn, and stepped off the line; (4) defendant had to put his foot down during the one-legged stand and used his arms to balance; (5) defendant exhibited all six clues on the HGN test; and (5) based on Intoxilyzer results, defendant had a breath alcohol level of .146. Similarly, in *United States v. King*, 894 F. Supp. 2d 737 (W.D. Va. 2012), defendant (1) admitted to having drank 3-4 beers "on and off" all afternoon; (2) exhibited the maximum number of clues on the HGNT and one-legged stand; (3) had trouble maintaining his

balance and following directions; and (4) was driving in the dark without his headlights. *Id.* at 746. Additionally, the video confirmed defendant was unsteady throughout the SFSTs. *Id.*

In *United States v. Hall*, 497 F. App'x 299 (4th Cir. 2012), defendant (1) left the roadway and nearly hit a concrete wall before hitting another vehicle; (2) smelled of a strong odor of alcohol; (3) fell into an open car door when asked to step outside the vehicle, and (4) exhibited signs of impairment while performing the SFSTs. *Id.* at 301. In *United States v. Stanton*, 501 F.3d 1093 (9th Cir. 2007), the evidence showed defendant (1) had consumed numerous glasses of four different wines for 3 hours; (2) smelled of alcohol, had bloodshot watery eyes, and slurred speech; (3) was unsteady getting out of the vehicle; (4) swayed and wobbled during the SFSTs; (5) could not complete the one-legged stand; (6) did poorly on the walk-and-turn; and (7) admitted to law enforcement that he was feeling "buzzed." *Id.* at 1100. In *United States v. Wilson*, 711 F. App'x 706 (4th Cir. 2017), the defendant (1) smelled of alcohol, (2) vomited on the doorframe of his car; and (3) acted abnormally when interacting with officers including screaming, yelling profanities and threatening their families. *Id.* at 709-10.

In *United States v. French*, 468 F. App'x 737 (9th Cir. 2012), defendant (1) had bloodshot watery eyes, slurred speech, smelled of alcohol, and was visibly upset and agitated; (2) was unable to follow instructions during the HGNT; (3) failed to

complete the walk and turn or one-legged stand; and (4) had a blood alcohol content that was twice the legal limit 90 minutes after being pulled over. *Id.* at 739. In *United States v. Hamilton*, 813 F. App'x 347 (10th Cir. 2020), defendant (1) had slurred speech, blood shot eyes, and smelled of alcohol; (2) was seen driving into a parked jeep and nearly colliding with another vehicle; (3) performed poorly on the SFSTs; and (4) asked what happened when he was asked if he was okay. *Id.* at 349. In *Volk v. United States,* 57 F.Supp.2d 888 (N.D. Cal. 1999), the evidence showed defendant (1) smelled of alcohol; (2) performed questionably on the alphabet test; (3) swayed side to side during the HGN Test; (4) had three empty bottles of alcohol in the car; (5) admitted to drinking and driving; and (6) had an alcohol level of twice the legal limit. *Id.* at 898.

Finally, in *United States v. Engle*, 428 F. Supp. 3d 1259 (D. Wyo. 2019), a case involving controlled substances, rather than alcohol, and relied upon by the Government, the evidence showed (1) eye examinations performed presented factors attributed to drug impairment, including lack of convergence and erratic movement of the eye; (2) defendant had difficulty completing the finger to nose test; (3) defendant was unable to remember instructions, unable to follow instructions, unable to keep balance, and unable to properly complete the SFSTs; and (4) defendant's body swayed or had tremors during the tests.

Instead of those cases, the facts here are more closely aligned with the facts in *United States v. Foster*, where the court adjudicated the defendant not guilty under 36 C.F.R. § 4.23(a)(1). In *Foster* there was evidence from a breath test that defendant had been drinking; however, the court found the "field evidence" to be "a bit of a mixed bag." *Foster*, 829 F. Supp. 2d at 369. While the Rangers testified they observed defendant having difficulty standing, defendant's performance on the SFSTs "calls into question any suggestion that [defendant] was unable to maintain his balance that evening." *Id.* As the court noted, defendant was able to hold one foot six inches in the air and count, and although he swayed, he never put his foot down. *Id.* at 370. Also, similar to this case, although the Rangers testified defendant's speech was slurred, "there was no indication [defendant] appeared confused or nervous." *Id.* The court noted defendant had no trouble finding and handing over his license and registration, and although he admitted to "pre-gaming" before the race hours earlier, there was no testimony regarding how much alcohol defendant had consumed. *Id.*

While it is not the Court's intent or desire to Monday morning quarterback law enforcement's on-the-field decisions, the Court also cannot ignore the video evidence. Although Lyons admitted to having used controlled substances more than 14 hours before the stop, and exhibited "some clues" on the SFSTs, there is no evidence to establish how much Lyons used or even how much was still present in

his system. Moreover, Lyons was oriented, able to communicate coherently with the Ranger, and followed instructions. He was also able to maintain his balance during both SFSTs. Thus, as in *Foster,* "[g]iven the government's high burden of proof, the Court does not believe the evidence in this case rises to a level sufficient to prove beyond a reasonable doubt that Lyons was [under the influence] to a degree that rendered him incapable of safe operation of his vehicle." Foster, 36 C.F.R. § 4.23(a)(1). His conduct and interaction with the Ranger and his performance on the SFSTs simply do not bear that out.

## II. SPEEDING

Aside from Ranger Henderson's testimony at trial, the only evidence the Government introduced as to the rate of speed Lyons was traveling at the time of his stop was Ranger Henderson's statement to Lyons that he stopped him because he was traveling 59 mph in a 35 mph zone. The Court does not find that evidence to be proof beyond a reasonable doubt of Lyons' speed.

First, the incident occurred almost one year ago and thus Ranger Henderson's memory of the exact speed of travel does not carry as much weight as what he did contemporaneously on the traffic stop. Second, despite what Ranger Henderson told Lyons when he stopped him, Ranger Henderson wrote on the probable cause statement and the citation he issued to Lyons that Lyons was traveling 49 in a 25 mph zone. These documents were completed on the date of the incident. Ranger

Henderson wrote the same information on the General Report, prepared 13 days later.³  Given this discrepancy, the Court cannot say that what Ranger Henderson told Lyons at the scene was accurate while the forms he completed were inaccurate. Indeed, although the Government argued Ranger Henderson simply miswrote the speed because most of the National Seashore is 25 mph, and he had in his mind that Lyons was traveling 24 miles over the speed limit, the Court notes Ranger Henderson passed at least five 35 mph signs during his stop of Lyons.

Accordingly, IT IS THEREFORE ORDERED:

1. Defendant is found NOT GUILTY of violating 36 C.F.R. § 4.23(a)(1) (Count One).

2. Defendant is found NOT GUILTY of violating 36 C.F.R. § 4.21(c) (Count Two).

DONE AND ORDERED this 19th day of April 2023.

/s/ Hope Thai Cannon
HOPE THAI CANNON
UNITED STATES MAGISTRATE JUDGE

---

³ Additionally, the Government did not correct this error until approximately one week before the trial by filing a superseding information.  Up until that point, the information charged Lyons with going 49 in a 25 mph zone.

Case No. 3:22mj447-HTC